```
              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION
```

| | |
|---|---|
| JOHN C. BRELETIC, JR., | |
| Plaintiff, | CIVIL ACTION |
| v. | NO. 1:04-CV-3252-CAP |
| CACI, INC. – FEDERAL, | |
| Defendant. | |

### O R D E R

**Factual Background**

Because this matter is before the court on a motion to dismiss [Doc. No. 10], the court must accept the facts pled in the complaint as true and construe them in the light most favorable to the plaintiff.  See Linder v. Portocarrero, 963 F.2d 332, 334 (11th Cir. 1992).

CACI, Inc. – Federal provides IT systems integration and managed network solutions to businesses and contractors.  Its products are directed toward the improvement of communications and security, the enhancement of data collection and analysis, and increasing efficiency and mission effectiveness for its clients.  One of CACI's clients is the United States Army, for which it supplies both classified and unclassified IT systems

and solutions.  In doing so, CACI occasionally employs members and former members of the United States Army.

On February 1, 2000, CACI hired the plaintiff, John C. Breletic, Jr., as an operations research analyst.  As a research analyst, Breletic was responsible for organizational analysis, organizational integration, and force integration projects for classified and unclassified projects as directed by the Deputy Chief of Staff for Operations at the U.S. Army Forces Command ("FORSCOM") located at Fort McPherson, Georgia.  As a condition of his hiring, CACI required Breletic to sign an employment agreement ("2000 Employee Agreement") that contained a mandatory arbitration provision ("2000 Arbitration Agreement").  The 2000 Arbitration Agreement stated:

> Any controversy or claim arising out of, or relating to this Agreement, or its breach, or otherwise arising out of or relating to my CACI employment or the termination of such employment (including without limitation to any claim of discrimination whether based on race, color, religion, national origin, gender, age, sexual preference, disability, status as a disabled or Vietnam-era veteran, or any other legally protected status, and whether based on federal or State law, or otherwise) shall be settled first by resort to mediation by CACI's Ombudsman and then, if mediation fails to resolve the matter, by arbitration. This arbitration shall be held in Arlington, Virginia in accordance with the American Arbitration Association's Rules for the Resolution of Employment Disputes.  Judgment upon award rendered by the arbitrator shall be binding upon both parties and may

>be entered and enforced in any court of competent jurisdiction.

2000 Employee Agreement ¶ 12, Ex. A to Declaration of John C. Breletic, Jr. [Doc. No. 16].  The 2000 Employment Agreement also contained a choice of law provision which provides that the 2000 Employee Agreement was governed by Virginia state law.  2000 Employee Agreement ¶ 18, Ex. A to Declaration of John C. Breletic, Jr. [Doc. No. 16].

From February 2000 until October 2, 2001, Breletic worked on various projects under the supervision of Joseph Fleck, a CACI senior director.  Ultimately, however, Breletic was asked to focus his attention upon activation efforts associated with the development, staffing, and coordination of a new military organization, the Air Traffic Services Command ("ATSCOM"), which was to provide command and control of United States Army air traffic services worldwide.

In September 2001, Breletic provided Fleck with verbal and e-mail notification of his impending call to active duty in the army.  On October 3, 2001, Breletic was ordered to active military duty.  While Breletic was on active duty, the ATSCOM project was formally activated and stationed at Fort Rucker, Alabama.  Of the eleven CACI employees supporting ATSCOM, one

chose to move to Fort Rucker to continue working on the project, two left the company, and the remaining employees were reassigned to other CACI projects supporting the Deputy Chief of Staff for Operations at FORSCOM in Fort McPherson, Georgia. On September 4, 2003, while he was still on active duty, Breletic was contacted by Warren Edwards, an Atlanta Director of CACI, and informed that he no longer had a job with CACI unless he was willing to move to Fort Rucker.

On October 2, 2003, Breletic was released from active duty under honorable conditions. On November 5, 2003, he submitted a formal application for re-employment with CACI to Fleck and CACI's Human Resources Manager, Richard Hart. On November 19, 2003, Fleck told Breletic that his job had been abolished and re-employment was therefore impossible. According to Breletic, however, CACI was then advertising for a research analyst to perform analysis of existing operations affecting ATSCOM and acting as a liaison to FORSCOM at Fort McPherson.

Despite the availability of positions nearly identical to that which he had in 2001, Breletic was initially refused re-employment and told that he would have to interview for prospective jobs just as any other applicant would. After he contacted the National Committee for Employer Support of the

Guard and Reserve, an advocacy group dedicated to assisting reservists, CACI reinstated Breletic, but, according to Breletic, only so that it could provide him with 12 days notice of termination pursuant to CACI's policy concerning the termination of employees.  On December 19, 2003, Fleck wrote to Breletic and informed him that he was terminated as of December 19, 2003.

Breletic filed his complaint on November 3, 2004 [Doc. No. 1], alleging that CACI violated various provisions of the Uniform Services Employment and Re-Employment Rights Act, 38 U.S.C. § 4301, et seq. ("USERRA").  In his two-count complaint, Breletic alleged that CACI failed to properly reinstate him at the conclusion of his active military service and that CACI discriminated and retaliated against him on account of his military service and his attempt to exercise his rights under the USERRA.

In December 2004, Breletic was offered a new position by CACI. CACI presented Breletic with a new employment agreement ("2004 Employment Agreement") that contained an arbitration provision ("2004 Arbitration Agreement") providing that questions of arbitrability of disputes would be presented to the arbitrator.  The 2004 Arbitration Agreement stated:

> Any controversy or claim arising out of, or relating to this Agreement, or its breach, or otherwise arising out of or relating to my recruitment by, my employment with, or the ending of my employment with, CACI (including any claim of discrimination whether based on race, color, religion, national origin, gender, age, sexual preference, disability, status as a disabled or Vietnam-era veteran, or any other legally protected status, and whether based on federal or State law, or otherwise), will be settled first by resort to mediation by CACI's Ombudsman and then, if mediation fails to resolve the matter, by arbitration. This arbitration will be held in accordance with the American Arbitration Association's then-current Rules for the Resolution of Employment Disputes, a copy of which is available from CACI Employee Services. The arbitrator, and only the arbitrator, will decide any and all disputes regarding whether a claim is arbitrable. In the event the arbitrator decides that any given matter is not arbitrable, the matter will be decided by a court of competent jurisdiction. Judgment upon award rendered by the arbitrator will be binding upon both parties and may be entered and enforced in any court of competent jurisdiction.

2004 Employee Agreement at unnumbered page 4, Ex. C to Declaration of John C. Breletic, Jr. [Doc. No. 16]. The 2004 Employee Agreement also states that it "will be governed by the laws of the Commonwealth of Virginia without regard to conflict of laws provisions." 2004 Employee Agreement at unnumbered page 2, Ex. A to Declaration of John C. Breletic, Jr. [Doc. No. 16].

The 2004 Employee Agreement also stated:

> This Agreement, together with the terms of: (i) the CACI Code of Ethics and Business Conduct Standards, (ii) my CACI Application of At-Will Employment and the CACI offer letter to me that I signed, and (iii) all

>
> other documents that I sign, which describe policies, obligations and/or restrictions applicable to me during the period of my employment make up the complete agreement I have with CACI regarding the terms of my employment and supersede all Employee Agreements that I have signed with CACI before the date of this Agreement.

2004 Employee Agreement at unnumbered page 2, Ex. C to Declaration of John C. Breletic, Jr. [Doc. No. 16].

Breletic obtained the written promise from Fleck that the terms of his employment, as reflected in the 2004 Employment Agreement, would be subject to "any and all rights [Breletic] may have under [USERRA]." December 6, 2004, Letter, Ex. B to Declaration of John C. Breletic, Jr. [Doc. No. 16]. With that reservation, Breletic signed the agreement.

Breletic has never sought to arbitrate his claims against CACI under either the 2000 Arbitration Agreement or the 2004 Arbitration Agreement. Rather, Breletic filed an amended complaint on December 9, 2004 [Doc. No. 2], in which he changed the named defendant from "CACI International Inc. d/b/a CACI, Inc. – Federal" to "CACI, INC. – FEDERAL." In the amended complaint, Breletic made the same allegations as he made in his original complaint. The parties have engaged in unsuccessful private mediation, but Breletic has refused CACI's request to drop this suit and pursue his claims through arbitration.

7

## Legal Analysis

In its brief, CACI argues that all of Breletic's claims are subject to mandatory binding arbitration under the express terms of the 2004 Arbitration Agreement which, according to CACI, superseded the 2000 Arbitration Agreement. Thus, according to CACI, the court should dismiss the complaint and compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-307 ("FAA").

In response, Breletic argues that both of the arbitration agreements are unenforceable for two principal reasons. First, Breletic argues that the arbitration agreements are invalid because of a lack of consideration. Second, Breletic argues that the USERRA prohibits the mandatory, binding arbitration of claims arising under that statute.

Before addressing the arguments of the parties, the court notes that the FAA was enacted in 1925 as a response to the hostility of American courts to the enforcement of arbitration agreements. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 111, 121 S. Ct. 1302, 1307 (2001). In order to give effect to this purpose, the FAA compels judicial enforcement of a wide range of written arbitration agreements. Id. The FAA's coverage provision, Section 2, provides, "A written provision

in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA also provides that a court must stay its proceedings if it is satisfied that the issue before it is referable to arbitration under such an agreement.  Id. § 3.  The FAA also authorizes a district court to issue an order compelling arbitration if there has been a failure, neglect, or refusal to comply with such an agreement.  Id. § 4.

The Supreme Court has held that these provisions established "'a broad principle of enforceability'" of arbitration agreements.  Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 685, 116 S. Ct. 1652, 1655 (1996) (quoting Southland Corp. v. Keating, 465 U.S. 1, 11, 104 S. Ct. 852, 858 (1984)).  Thus, the FAA requires that courts "'rigorously enforce agreements to arbitrate.'"  Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226, 107 S. Ct. 2332, 2337 (1987) (quoting Dean Whitter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S. Ct. 1238, 1242 (1985)).  Additionally, the Supreme Court has stated

that the general applicability of the FAA reflects Congress's preeminent concern "to enforce private agreements into which parties had entered," and, accordingly, that such agreements must be "vigorously enforced." Perry v. Thomas, 482 U.S. 483, 490, 107 S. Ct. 2520, 2526 (1987) (citations and quotations omitted).

In addressing an arbitration agreement that purportedly covers statutory claims, a court must conduct a two-step inquiry. Mitsubishi, 473 U.S. at 628, 105 S. Ct. at 3355. First, it must determine whether the parties' agreement to arbitrate reaches the statutory issues. Id. Second, the court must consider whether legal constraints external to the parties' agreement prohibit the arbitration of those claims. Id. Normally, in addressing the first step of the analysis, the court must determine whether (1) a valid written agreement to arbitrate exists between the parties, (2) the arbitration agreement applies to the relevant claims, and (3) the non-moving party has refused to arbitrate the claims. See Goldberg v. Donaldson, Lufkin & Jenrette Sec. Corp., 650 F.Supp. 222, 225 (N.D. Ga. 1986) (citing 9 U.S.C. §§ 2-4 and Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S. Ct. 1801 (1967)). Breletic has conceded that he has refused to arbitrate his

claims. Accordingly, he argues that the court need only address whether there is a valid arbitration agreement between the parties and whether the dispute that has arisen falls within the scope of that agreement. In this case, however, the court will begin by assuming without holding that a valid written arbitration agreement exists and that the claims made by Breletic are covered by the arbitration agreement. Thus, the court will first address whether there are any external legal constraints that foreclose the arbitration of Breletic's USERRA claims.

Breletic argues that the USERRA preempts the arbitration agreements in this case. In Gilmer v. Interstate/Johnson Lane Corp, 500 U.S. 20, 26, 111 S. Ct. 1647, 1652 (1991), the Supreme Court held, "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." The Supreme Court noted that it had previously held arbitration agreements enforceable that related to various claims arising under numerous statutes, and, according to the Court, "In these cases we recognized that 'by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum.'"

Id. (quoting Mitsubishi, 473 U.S. at 628, 105 S. Ct. at 3354).

The Court then held that, even though all statutory claims might not be appropriate for arbitration, since the plaintiff made the bargain to arbitrate, he should be held to it "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue," and the burden is upon the plaintiff to demonstrate such Congressional intent. Id. The court then stated, "If such an intention exists, it will be discoverable in the text of the [statute], its legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes." Id. The Court noted, however, that throughout such an inquiry, one must bear in mind that "'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'" Id. (citing Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983)). Following Gilmer, the court will first look to the text of the USERRA itself and then turn to the legislative history of the statute.

First, 38 U.S.C. § 4301 states:

**Purposes; sense of Congress**

(a) The purposes of this chapter are–

> (1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service;
>
> (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and
>
> (3) to prohibit discrimination against persons because of their service in the uniformed services.

(b) It is the sense of Congress that the Federal Government should be a model employer in carrying out the provisions of this chapter.

The plain language of this section indicates that Congress intended to grant certain rights to those who serve in the armed forces and to ensure that the federal government serve as a model employer with regards to those in its armed forces. There is nothing, however, in this section that indicates Congress intended to prohibit a person in the armed forces from waiving his or her right to a judicial forum for the vindication of those rights created by the USERRA.

Next, 38 U.S.C. § 4302 states:

**Relation to other law and plans or agreements**

(a) Nothing in this chapter shall supersede, nullify or diminish any Federal or State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that establishes a right or benefit that is more beneficial to, or is in addition to, a right or benefit provided for such person in this chapter.

(b) This chapter supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates *in any manner* any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit.

(emphasis added). Relevant to this case, Section 4302(b) states that the USERRA supersedes any contracts that reduce, limit, or eliminate in any manner any rights or benefits provided by the USERRA, including the establishment of additional prerequisites to the exercise of any such right. Arbitration agreements are contracts, and the FAA placed "arbitration agreements on an even footing with all other contracts." Anders v. Hometown Mortgage Services, Inc., 346 F.2d 1024, 1032 (11th Cir. 2003). Accordingly, the USERRA supersedes any arbitration agreements that abrogate in any manner the rights provided by the USERRA as described in the text of the statute.

As the court noted previously, the Supreme Court has held that, by entering into an arbitration agreement covering statutory claims, a party does not relinquish his or her substantive rights provided by the statute. Instead, the party simply submits the determination of those rights to an arbitral rather than a judicial forum. See Gilmer, 500 U.S. at 26, 111 S. Ct. at 1652. Breletic, however, argues that 38 U.S.C. § 4323(c) guarantees a service member the right to bring an action in any federal court in any state in which the employer maintains a place of business and without fees or court costs being charged or taxed. The 2000 Arbitration Agreement, however, requires Breletic to give up these rights. In particular, it requires Breletic to travel to Virginia even though CACI maintains a place of business in Georgia; incur the costs of travel to Virginia for the arbitration; and pay the $125 initial filing fee. But the 2004 Arbitration Agreement expressly superseded the 2000 Arbitration Agreement, and, therefore, the 2000 Arbitration Agreement is irrelevant to the court's analysis. Nevertheless, the 2004 Arbitration Agreement requires Breletic to give up his right to bring an action in any federal court. Therefore, the 2004 Arbitration Agreement limits Breletic's rights under the USERRA in at least a minimal manner.

At the very least, the text of the USERRA is ambiguous as to its effect on arbitration agreements purportedly governing claims brought under the USERRA.  Thus, the court will now turn to the legislative history of the USERRA.

> The House Report on Section 4302(a) of the USERRA states:
>
> Section 4302(b) would reaffirm a general preemption as to State and local laws and ordinances, as well as to employer practices and agreements, which provide fewer rights or otherwise limit rights provided under amended chapter 43 or put additional conditions on those rights.  Moreover, this section would reaffirm that additional resort to mechanisms such as grievance procedures or arbitration or similar administrative appeals is not required.  It is the Committee's intent that, even if a person protected under the Act resorts to arbitration, any arbitration decision shall not be binding as a matter of law.  The Committee wishes to stress that rights under chapter 43 belong to the claimant, and he or she may waive those rights, either explicitly or impliedly, through conduct. Because of the remedial purposes of chapter 43, any waiver must, however, be clear, convincing, specific, unequivocal, and not under duress. Moreover, only known rights which are already in existence may be waived.  *An express waiver of future statutory rights, such as one that an employer might wish to require as a condition of employment, would be contrary to the public policy embodied in the Committee bill and would be void.*

H.R. Rep. No. 103-65 (1994), as reprinted in U.S.C.C.A.N. 2453 (emphasis added).  Thus, the Congressional intent behind the USERRA is clear: Section 4302(b) was intended to preempt employer-employee agreements that limit rights provided under the USERRA or put additional conditions on those rights.  The

House Report evidences the intent of Congress that an arbitration decision would not be binding in this situation, even if a person covered by the USERRA resorted to arbitration. Furthermore, the 2004 Arbitration Agreement is an express waiver of future USERRA rights, i.e., Breletic's right to bring his claim in a judicial forum, and such waivers are against the public policy behind the USERRA.  Thus, given the language of Section 4302(b) and the legislative history of the USERRA, the court holds that the USERRA grants those covered by it the right to pursue their claims in a judicial forum and that the USERRA preempts arbitration agreements purportedly covering claims arising under the USERRA.

In response to Breletic's argument, CACI notes that in the 2004 Arbitration Agreement the parties expressly agreed, "The arbitrator, and only the arbitrator, will decide any and all disputes regarding whether a claim is arbitrable."  2004 Employee Agreement at unnumbered page 4, Ex. C to Declaration of John C. Breletic, Jr. [Doc. No. 16].  According to CACI, the issue of whether the USERRA preempts the arbitration agreement between CACI and Breletic is a question of whether Breletic's claims are arbitrable, and, therefore, that issue must be resolved by an arbitrator.  The court disagrees.  The issue of

17

whether the USERRA preempts the arbitration agreements at issue is logically prior to the issue of whether Breletic's claims are arbitrable under the terms of the arbitration agreements.  If the USERRA preempts the arbitration agreements, then there simply is no issue regarding the arbitrability of Breletic's claims because, in effect, there is no agreement to arbitrate.  Thus, though the parties may have intended for Breletic's claims to fall within the scope of the arbitration agreements, the USERRA precludes the arbitration of those claims.

Finally, the legislative history of the USERRA quoted above indicates that a person can waive his or her rights under the USERRA, but any such waiver must "be clear, convincing, specific, unequivocal, and not under duress.  Moreover, only known rights which are already in existence may be waived."  H.R. Rep. No. 103-65 (1994), as reprinted in U.S.C.C.A.N. 2453.  As the court previously noted, Breletic signed the 2004 Arbitration Agreement after the commencement of his suit, and that agreement expressly superseded the 2000 Arbitration Agreement.  The legislative history indicates that a party may waive rights that were already in existence and known to the party.  In this case, Breletic already knew about his rights (as evidenced by his filing suit) when he entered into the 2004

Arbitration Agreement.  Thus, it could be argued that he waived his right to bring his claims in a judicial forum.  As the legislative history indicates, however, such a waiver "must be clear, convincing, specific, [and] unequivocal."  In this case, the court holds that the 2004 Arbitration Agreement is not a clear waiver of Breletic's then-existing rights.  The December 6, 2004, letter offering Breletic employment at CACI stated, "The terms of your at-will employment, as described in the attached Employee Agreement, will be subject to any and all rights you may have under The Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA)."  The court holds that this reservation sufficiently preserved Breletic's right to bring his claims in a judicial forum, and, therefore, the 2004 Arbitration Agreement did not constitute a waiver of those known rights.  For all of these reasons, the court DENIES the defendant's motion to dismiss and compel arbitration [Doc. No. 10].

    SO ORDERED, this 24th day of January, 2006.


                                /s/ Charles A. Pannell, Jr.
                                CHARLES A. PANNELL, JR.
                                United States District Judge